ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

DAVID STEBBINS                              PLAINTIFF

vs.                        Case No. CV 11-3057

LEGAL AID OF ARKANSAS                       DEFENDANT

## DEPOSITION OF DAVID STEBBINS

Location:     Boone County Sheriff's Office
                5800 Law Drive
                Harrison, AR

Date:         Thursday, August 2, 2012

Time:         10:10 a.m.

**APPEARANCES:**

**ON BEHALF OF PLAINTIFF:**

Mr. David Stebbins (Pro Se)
123 W. Ridge Street, Apt. D
Harrison, AR 72601

**ON BEHALF OF DEFENDANT:**

Mr. J. David Dixon
Davis, Clark, Butt, Carithers & Taylor
P.O. Box 1688
Fayetteville, AR 72702

(Proceedings recorded by Stenomask. Transcript produced from dictation.)

*Wisdom Court Reporting*
Lisa K. Wisdom, CCR
3458 Hwy. 221 North • Berryville, AR 72616
(870) 423-2187

EXHIBIT A

```
 1   Number 10-3305, in the Western District of Missouri.
 2   Q    (Mr. Dixon continuing.)  Thank you.  You said you
 3   had -- you've been employed, a couple of times, in your
 4   life.  Where else have you been employed?
 5   A    Sonic, Wendy's.  At the University of Arkansas, I
 6   worked at Mullins Library, as a work-study job.
 7   Q    Okay.  Do you remember when you worked at Sonic?
 8   A    That was my first job.  I was still a minor.
 9   During the summer of 2006, all -- all the way up to
10   November of 2006.  I don't remember the exact dates,
11   though.
12   Q    That's fine.  What about Wendy's?
13   A    Two times, at two different Wendy's.  Both have
14   been in 2008.
15   Q    Okay.  U of A?  When did you work at the U of A?
16   A    For the fall, 2007, semester.
17   Q    Okay.  Is that all the places you've been employed
18   at?
19   A    Those are all the places I've actually been
20   employed at, yes.  I've done a couple of odd jobs that
21   won't actually show up on any like employment history
22   or anything.
23   Q    Okay.  And why did you leave Sonic?
24   A    In the month of November, my hours were reduced to
25   only six hours a week.  And, even then, I would get
```

```
 1  sent home early, so it would cost more for me to drive
 2  there than I got paid.
 3  Q    Okay.  What about Wendy's?  Why did you leave
 4  Wendy's?
 5  A    The work was too strenuous.  I would -- I would
 6  sometimes, literally, come close to physically
 7  fainting.
 8  Q    Okay.  University of Arkansas?  Why did you leave
 9  --
10  A    Because I got expelled, and now I'm suing them,
11  also.  Case Number 10-5125, in this court.
12              MR. DIXON:  Is he talking slow enough?
13              COURT REPORTER:  It would help to slow
14  down.
15              MR. DIXON:  Okay.  All right.
16  Q    (Mr. Dixon continuing.)  No offense, Mr. Stebbins.
17  I can't imagine how hard it is for her to record
18  everything we're saying.
19  A    Okay.  I --
20  Q    I think she got everything you just got through
21  saying, though.
22  A    Okay.
23  Q    Ever been married?
24  A    No.
25  Q    Okay.  You submitted some discovery responses to
```

1   in time to appeal it.  But, of course, if they had not
2   retaliated against me, in the first place, that
3   wouldn't have mattered.  They could have appealed it
4   for me.
5   Q    Okay.
6            MR. STEBBINS:  Was that too fast?
7            COURT REPORTER:  Just try to slow down.
8   But I'm getting it.
9            MR. STEBBINS:  Okay.
10           MR. DIXON:  Thank you for your
11  cooperation.  I appreciate that.
12  Q    (Mr. Dixon continuing.)  Tell me about your
13  education.  What sort of education do you have?
14  A    I would have graduated from high school right on
15  time -- I never -- I never even got so much -- I don't
16  think I even got so much as a D, except in English,
17  which was, easily, my worst subject.  And I spent a
18  semester at the University of Arkansas, before they
19  discriminated against me.  And I'm suing them for that,
20  as I previously mentioned.  And I finished a couple of
21  years at North Arkansas College, here in Harrison.
22  Q    Okay.  Where did you graduate from high school?
23  A    Bergman.
24  Q    Bergman?  Where is that?
25  A    It's in the outskirts of Harrison.

```
 1   filled -- filed -- like a -- like a withdrawal of the
 2   protective order motion that I can sign, that you can
 3   file it for me, I would cooperate.
 4   Q    Okay.  All right, I'll consider that.  Thank you.
 5   A    Okay.  Of course, I can't -- you'll have to come
 6   back here with that motion, in person, because, if I'm
 7   going to mail it to you, I might as well just mail it
 8   to the Court.  Again, I would need an envelope.
 9   Q    Okay.  Well, if I do that, I would -- I would send
10   you a stamped --
11   A    I don't -- that would be --
12   Q    Oh, would it?
13   A    -- contraband here.
14   Q    Oh, would it?  Okay.  Well, I don't know.  We can
15   -- we'll try to work it out.
16   A    Okay.
17   Q    Any other post-high school education?
18   A    I spent a couple of months going to the University
19   of Phoenix, online.
20   Q    Okay.
21   A    Nothing came of it.
22   Q    Okay.  You mentioned you went to another
23   university, around here.  What was that?
24   A    North Arkansas Community College, here in
25   Harrison.
```

```
1   Q      Okay.  How long did you attend that?
2   A      Couple of years.
3   Q      Okay.  And were you working toward a degree?
4   A      I was trying to.
5   Q      What degree were you working toward?
6   A      Business Management.
7   Q      Okay.  And how many hours did you accumulate?  Do
8   you know?
9   A      I don't remember.
10  Q      So it was two or three years.
11  A      About two years --
12  Q      Okay.
13  A      -- yeah.  Fall of 2008 until spring of 2010, yeah.
14  Q      Okay.  And how did you do, in those classes?
15  A      The ones that I didn't withdraw from, I passed.
16  Q      Okay.  All right.  And was it A, B, or C?  Do you
17  recall?
18  A      Very good grades.  On good -- on good terms with
19  my teachers.
20  Q      Okay.  We've already gone into your Asperger's.
21  Is that the only disability that you have?
22  A      Recently, I understand that I have been diagnosed,
23  behind my back, with Intermittent Explosive Disorder.
24  I don't believe that, for a minute.  I've been off any
25  medications that I'd previously taken that was to
```

```
 1   A     He's an associate -- he's an Assistant Prosecuting
 2   Attorney.  The main D.A. is Ron Kincade.
 3   Q     Okay.
 4   A     That's K-i-n-c-a-d-e.
 5   Q     Tell me, how does -- how does your disability
 6   affect you?
 7   A     It makes it difficult for me to do such things as
 8   hold a job, make friends, get a girlfriend.  Things
 9   like that.  I can upset people, without even realizing
10   it.  Or I can be fired, in a week, like I mentioned
11   about Reliable.  It's hard for me to keep friends,
12   though I do have a few, and it's hard for me to find
13   girlfriends.
14   Q     Okay.  And I don't mean to press too hard about
15   your disability, but what -- you say -- you say certain
16   things that are inappropriate?  Is that what you're
17   telling me?
18   A     Apparently, I -- often, I don't even realize
19   they're inappropriate, even when it's brought to my
20   attention.  Half the time, when I -- I can look, in
21   hindsight, and see how it would be offensive.  But --
22   for example, in this case, I -- to this day, I do not
23   know what upset your client so much that they would
24   send me a letter saying they would not assist me, on
25   any matter.
```

```
 1   A     Qui tacet consentire videtur.  It's a Latin
 2   phrase, but it's translated into English, he who is
 3   silent is taken to agree.  And, if he doesn't actually
 4   give an explanation for what prompted Exhibit O, then
 5   I'm -- then my accusation that it was my Asperger's,
 6   combined with Exhibit K, should stand.
 7   Q     Okay.  So is it merely the fact that he didn't
 8   explain why he's not going to represent you that you
 9   assume that it was because of your disability?
10   A     Well, I'm assuming, based on numerous previous
11   incidents.  I'm putting two and two together.
12   Q     What previous incidents are you talking about?
13   Are you talking about incidents with him?
14   A     Incidents with humanity.
15   Q     Oh.
16   A     Incidents with society.
17   Q     Okay.  Well, is there any -- of his prior behavior
18   that suggests that he had some sort of malintent
19   against your disability?
20   A     Malintent, no.  A failure to -- but just not --
21   apathy.  Perhaps apathy and not being -- and I just
22   don't feel like providing reasonable accommodations for
23   your Asperger's Syndrome.  Ninety-nine percent of the
24   time, that's what happened.
25   Q     Okay.  Was there anything that he actually
```

```
 1   physically or verbally said to you -- did or verbally
 2   said -- verbally said to you, that would make you think
 3   that he had some sort of discriminatory animus toward
 4   your disability?
 5   A     Exhibit O.
 6   Q     Anything prior to that?
 7   A     No.  That's why I never filed a suit against him,
 8   before this.
 9   Q     Okay.  So it's based on this Exhibit O, only, that
10   you're saying -- that you believe that he --
11   A     No.
12   Q     -- declined to represent you, because of your --
13   A     No.  No.  No.  I had had dozens, scores of
14   previous incidents that combine that could make me put
15   two and two -- that -- combined with Exhibit O, that
16   made me put two and two together.  How many times do I
17   have to tell you that?  It's not only Exhibit O.
18   Q     Okay.  All right.  Let's take a deep breath, all
19   right?  I've got 11:20.  Do you need to take a break or
20   anything?
21   A     Lunch is at noon.  We'll take a break then.
22   Q     Okay.  The -- the previous incidents you're
23   referring to, they're from other people.  Is that
24   correct?
25   A     Well, they're -- well, they're part of a group
```

```
 1   that Michael Loggains is also a group of.  It's called
 2   society.
 3   Q    All right.  So are you judging Michael Loggains,
 4   based on the way that the rest of the world --
 5   A    I'm judging a homo sapien, based on previous
 6   incidents with homo sapiens.
 7   Q    Okay.  All right.  Do you believe that you're
 8   stereotyping Mr. Loggains, as being a discriminatory --
 9   A    I am stereotyping him as being human.  Not
10   understanding my Asperger's, to the fullest degree,
11   and, thus, not providing accommodations that cause
12   failure to understand it is not -- is not an excuse for
13   discrimination, as long as I -- unless I -- unless I
14   refuse to explain it.  And I never refuse to explain
15   it.  In fact, I've always been very cooperative with
16   people's requests for explanations about what
17   Asperger's Syndrome is.
18   Q    Perhaps Mr. Loggains simply didn't like the way
19   that you styled your hair.  Would that be
20   discriminatory?
21   A    It would be automatically pretextual.  Now, think
22   about this, for a minute.  I have heard -- I've read,
23   on the internet, about things like Apple employment,
24   how you can be fired for, for example, wearing a red
25   shirt.  The bottom line, however, is that -- how many
```

```
 1   A      If they had just done that, all would have been
 2   fine.  All would have been gumdrops and ice cream.
 3   Q      Okay.  Well, what if they made that decision,
 4   prior to even modifying any alleged policy?  "We don't
 5   think he has a winnable case; thus, we don't need to
 6   modify our policy."  Would you agree with that?
 7   A      On one case, that would have been sufficient, no
 8   harm no foul.  But, again, Exhibit O means that,
 9   regardless of the merits, even if I have a winnable
10   case, "No, we're not going to -- we're not going to --
11   we're never going to represent you again."  That is
12   what I'm suing for.  This is a very narrowly -- this is
13   a very specific and narrow issue, and you're just
14   trying to make up these other hypothetical situations
15   that -- I mean, if -- there's a lot of things that all
16   had to happen at once, and, if even one variable was
17   missing, I may not have -- I may not have had this
18   case.  But the fact that all the things happened, as
19   they did, is what gave me this case.  So you're making
20   up all these extra variables, and, if even one of these
21   things were true, I would not -- it would not have
22   worked.  I -- I would not have filed this case.
23   Q      What proof do you have that -- that the alleged
24   modification you requested was necessary for Legal Aid
25   to accommodate your disability?
```

1   A    The fact that this sort of -- well, modification
2   of policy is always necessary for me to, like, eat at a
3   restaurant without offending the waitress.  Go to the
4   University of Arkansas without them feeling threatened.
5   Be here, at the jail, without me getting locked down,
6   every two minutes, for smarting off to the jail staff.
7   The fact that it's needed -- that accommodation is
8   needed for just about everything that I do.
9   Q    Okay.  Well -- and you're bringing up instances
10  that are --
11  A    Again, I've mentioned that my previous history
12  dealing with society, in general, will cause me to put
13  two and two together here.
14  Q    Okay.  So it's that experience that you believe
15  that it's necessary for --
16  A    It's -- it's the only accommodation that I,
17  personally, can think of.  And, if somebody else can
18  come along with an accommodation that's less
19  restrictive, on that company, yet would still get the
20  job done, well, then I'd be happy to hear that
21  accommodation to see if it would work for me.  But, as
22  of right now, this is the best accommodation that I can
23  think of.
24  Q    Let's talk about damages.
25  A    Okay.

```
 1   described some of the things that your disability can
 2   limit you.  Can you further explain to me exactly how
 3   it limits you, in your -- in your daily life?
 4   A    I don't understand why it wasn't clear the first
 5   time.  It makes it difficult for me to socialize.
 6   Makes it difficult for me to find a job.  It also makes
 7   it difficult for me to keep a job, make friends.  It's
 8   difficult -- I mean, because people get upset at me,
 9   for saying things that they don't like.  I don't --
10   what -- what isn't clear about that?
11   Q    Well, I'm kind of curious exactly what -- what --
12   not how it impacts others, but what -- upon you, what
13   sort of --
14   A    The fact that it forces me into solitude.  That I
15   have so much trouble getting along with people that I -
16   - I end up having to just stay by myself, most of the
17   time.
18   Q    Okay.  And the fact that you're forced into
19   solitude is not the disability, itself.  The disability
20   is what?
21   A    Asperger's Syndrome.
22   Q    Which is what?  What does it cause you to do?
23   A    It causes me to be tactless.  I don't -- I mean,
24   what is -- what is unclear about this?  You're just
25   repeating the same questions, hoping I give a different
```

```
 1  that your clients were satisfied that I was disabled,
 2  under the ADA -- they even contacted Harp & Associates,
 3  saying that I am a qualified individual with a
 4  disability, and that I need reasonable accommodations.
 5  Q    Well, let me ask you this.  Does your -- does your
 6  disability affect the way that you eat things or digest
 7  food?
 8  A    It affects a major life activity.
 9  Q    What --
10  A    Socializing.  Socializing is a major life
11  activity.  Making friends, finding dates, getting jobs.
12  That's -- those are major life activities.
13  Q    Okay.  Finding friends?
14  A    Yes.
15  Q    Getting jobs?
16  A    Yes.
17  Q    What else?  Socializing?
18  A    Just socializing, in general.  That's a major life
19  activity.
20  Q    Well, I know some people that aren't very social,
21  at all.  Do you consider them disabled?
22  A    People have to socialize, even if they're not
23  sociable.  They have to socialize.  Like, if they're
24  going shopping and speak to the cashier, they have to
25  socialize.  And socializing, even if you don't enjoy it
```

```
 1   A     And the fact is, I just keep on doing it, and I
 2   can't seem to control it.  I don't -- I can't stop
 3   pissing people off, and it makes it virtually
 4   impossible for me to socialize effectively.  Just like
 5   how a disabled person might could eat, as long as he
 6   doesn't eat -- he can't eat effectively.  He's still --
 7   he's still disabled.  I can't socialize effectively.
 8         Asperger's Syndrome, for that matter, has been
 9   repeatedly upheld, in the federal courts, as a
10   disability that qualifies for ADA protection.  So I've
11   got binding precedent there.
12   Q     Are you saying that someone that can't socialize
13   is disabled?
14   A     Yes.  Just as somebody who's deaf, he can't speak.
15   He's disabled.
16   Q     Well, hearing is a major life activity, right?
17   A     So is speaking.  So is socializing.  So is making
18   friends, getting jobs, getting girlfriends.
19   Q     Getting a girlfriend is a major life activity?
20   A     Reproduction.  Isn't that a major life activity?
21   It's an essential biological function.
22   Q     You can reproduce, can't you?
23   A     Oh, God.  Socializing.  Socializing.
24   Q     All right.  All right.
25   A     I think you're just grasping at straws, right now.
```

```
 1  You're trying to find something to get me on.
 2              MR. DIXON:  Mr. Stebbins, I thank you for
 3  your time.  I think I'm through, for the day.
 4              (Whereupon, the deposition of DAVID
 5  STEBBINS was concluded at approximately 1:35 p.m.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```